UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
────────────────────────────────────────
DAN-BUNKERING (AMERICA), INC.,

                            Plaintiff,

                -v.-

TECNOLOGIAS RELACIONADAS CON ENERGIA y
SERVICIOS ESPECIALIZADOS, S.A. de C.V., and
ARDICA CONSTRUCCIONES, S.A. de C.V.,

                            Defendants.
────────────────────────────────────────
```

17 Civ. 9873 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiff Dan-Bunkering (America), Inc. ("Dan-Bunkering") brought this action against Defendants Tecnologias Relacionadas con Energia y Servicios Especializados, S.A. de C.V. ("TRESE") and Ardica Construcciones, S.A. de C.V. ("Ardica"), claiming that Defendants had breached an agreement (the "Bunker Supply Agreement") between the parties pursuant to which, among other things, TRESE and Ardica had agreed to pay Dan-Bunkering $570,586.00. After TRESE defaulted in this action, Dan-Bunkering and Ardica proceeded to discovery and are now before the Court with cross-motions for summary judgment. Dan-Bunkering contends that it is entitled to summary judgment because Ardica admittedly failed to repay the amount it owed as set forth in the Bunker Supply Agreement. For its part, Ardica argues that the Bunker Supply Agreement was not supported by consideration and is therefore not a valid contract. For the reasons explained below, the Court grants Dan-Bunkering's motion and denies Ardica's motion.

# BACKGROUND[1]

## A.    Factual Background

From late 2015 to early 2016, Dan-Bunkering agreed to supply marine fuel products to TRESE, on credit, in connection with the "Agosto 12 Platform," a floating platform positioned in the Gulf of Mexico and used to produce compressed natural gas for Pemex, a Mexican energy company.  (Dan-Bunkering 56.1 ¶¶ 1-2, 4; *see also* Chester Decl., Ex. E).  At that time, TRESE and Ardica were members in a joint venture that provided services to Pemex in connection with the Agosto 12 Platform.  (Dan-Bunkering 56.1 ¶¶ 1-2, 4). Dan-Bunkering in fact supplied TRESE with marine fuel products on credit through a distributor, Enermar, and TRESE owed Dan-Bunkering the sum of $452,845.67 (the "Outstanding Amount") for the delivered products.  (*Id.* at ¶ 5).  Despite Dan-Bunkering having supplied TRESE with the marine fuel products, TRESE never paid Dan-Bunkering any portion of the Outstanding Amount.  (*Id.* at ¶ 6).

---

[1]    This Opinion draws on facts from Dan-Bunkering's Statement of Uncontested Material Facts ("Dan-Bunkering 56.1" (Dkt. #86)); the exhibits attached to the Declaration of Max B. Chester in Support of Plaintiff's Motion for Summary Judgment ("Chester Decl., Ex. []" (Dkt. #87)); Ardica's Statement of Uncontested Material Facts ("Ardica 56.1" (Dkt. #90, 94, 95); the exhibits attached to Ardica's Notice of Motion for Summary Judgment (Dkt. #91); Dan-Bunkering's Counterstatement of Material Facts (Dkt. #93, 99); and Ardica's Counterstatement of Material Facts (Dkt. #101).  Citations to the parties' Rule 56.1 Statements incorporate by reference the documents and deposition testimony cited therein.  *See* Local Rule 56.1(d).

For ease of reference, the Court refers to Dan-Bunkering's memorandum of law in support of its motion for summary judgment as "Dan-Bunkering Br." (Dkt. #85); Ardica's memorandum of law in support of its motion for summary judgment as "Ardica Br." (Dkt. #89); Dan-Bunkering's memorandum of law in opposition to Ardica's motion for summary judgment as "Dan-Bunkering Opp." (Dkt. #92); and Ardica's memorandum of law in opposition to Dan-Bunkering's motion for summary judgment as "Ardica Opp." (Dkt. #96, 97).  References to deposition transcripts are cited using the convention "[Name] Dep."

As a result, Dan-Bunkering engaged in a course of negotiation with TRESE and Ardica to recover the Outstanding Amount, employing both implicit and explicit threats of legal action.  On August 22, 2016, Oscar Obregon of Dan-Bunkering emailed a payment plan to Ricardo Silva of TRESE, which plan would allow TRESE to pay back the Outstanding Amount with interest and related costs over a period of seven months for a total of $570,586.  (Dan-Bunkering 56.1 ¶ 7).  Silva responded to Obregon's email later in the day on August 22, 2016, agreeing to repay $570,586 over seven months (with minor modifications to two monthly installments), and copied Jacobo Arias, majority owner/Chief Executive Officer of Ardica, and Leobardo George, Ardica's outside counsel, the latter of whom was providing legal services to TRESE at the time.  (*Id.* at ¶ 8).  In his email, Silva communicated his gratitude "in advance for [Obregon's] invaluable intervention to avoid legal problems, which do not benefit anyone," and expressed confidence that "this will be the beginning of a long-term service and collaboration relationship."  (*Id.* at ¶ 9).[2]

Dan-Bunkering prepared a contract to document the parties' agreement and sent it to TRESE for its and Ardica's signatures.  (Dan-Bunkering 56.1 ¶ 10).  The contract was titled "Bunker Supply Agreement" and was dated August 29, 2016.  (*Id.*).  On September 2, 2016, TRESE signed the Bunker Supply Agreement and forwarded it to Dan-Bunkering, but Ardica was delayed in providing its signature.  (*Id.* at ¶ 11).  TRESE claimed that Arias, who was to

---

[2]     The parties' emails contain certain spelling and typographical idiosyncrasies that are presented in this Opinion without edit.

sign the contract on behalf of Ardica, was feeling ill and that this was causing the delay.  (*Id.* at ¶ 12).  Obregon followed up on September 14, 2016, with an email to Arias, stating:

> Ricardo Silva confirmed that you are Ardica's legal representative and that you would sign such contract. If we do not receive your signature today, my office will immediately proceed legally seizing the jack-up platform from your sour gas compression project, preventing you from operating further with Pemex (in addition to taking other legal actions).  I kindly ask you to help me avoid such situation by sending me this executed agreement throughout the day.

(*Id.* at ¶ 13; Chester Decl., Ex. G).

Arias did not respond to this email but, the next day, Silva responded to Obregon, explaining that Arias was "doing a little better" with his illness and that TRESE would send a copy of the Bunker Supply Agreement signed by Ardica as soon as possible.  (Dan-Bunkering 56.1 ¶ 14; Chester Decl., Ex. G). Arias signed the Bunker Supply Agreement on behalf of Ardica and it was emailed to Dan-Bunkering on September 16, 2016.  (*Id.* at ¶ 15).  The Bunker Supply Agreement states that:

> [Dan-Bunkering] has previously supplied TR[ESE] with Products.   TR[ESE] now owes Dan-Bunkering an amount of USD 452,845.67 (the "Outstanding Amount").  In consideration of this TR[ESE] and [Ardica] agree[] to appoint [Dan-Bunkering] as their sole[] and exclusive supplier of Products during the terms of this Agreement and *to repay the Outstanding Amount plus interests as specified below in this Agreement.*

(Chester Decl., Ex. H (Bunker Supply Agreement or "BSA") § 2.1 (emphasis added)).  It also expressly states that Ardica and TRESE "jointly agree[] to pay

[Dan-Bunkering] an outstanding amount of USD 452,845.67 plus interests during the Term of this agreement." (BSA 1).

The Bunker Supply Agreement provides that the total amount to be repaid to Dan-Bunkering is $570,586 (consisting of $452,845.67 for previously delivered but unpaid marine fuel products, plus interest and costs), and that the amount is to be repaid over seven months according to an installment plan. (BSA § 7.1). The installment plan is explicated as follows:

> It is agreed between the Parties that [TRESE] and [Ardica] will pay the full Outstanding Amount according to the following payment plan (the "Payment Plan"):

| | |
|---|---|
| October 28, 2016: | USD 200,000.00 |
| November 28, 2016: | USD 50,000.00 |
| December 28, 2016: | USD 50,000.00 |
| January 28, 2017: | USD 100,000.00 |
| February 25, 2017: | USD 52,845.00 |
| March 7, 2017: | USD 58,870.00 |
| April 7, 2017: | USD 58,870.00 |

> Payments in total inclusive interests: USD 570,586.00.

(*Id*.). The Bunker Supply Agreement also states that the payment "constitutes an unconditional obligation on the part of [TRESE] and [Ardica] and the obligation shall be enforceable immediately and without the need for prior judgment." (*Id.* at § 7.2).

The Bunker Supply Agreement was more than just an agreement for Ardica and TRESE to refinance an amount TRESE previously owed to Dan-Bunkering. It also provided terms by which TRESE and Ardica would purchase

5

marine fuel product from Dan-Bunkering, as their exclusive supplier.  (Dan-Bunkering 56.1 ¶ 20; *see generally* BSA).  Ardica and TRESE were "obliged to order [marine fuel] by sending a written Nomination to [Dan-Bunkering] stating delivery place, delivery date and window, the specific Product required and the name of the vessel which is to be supplied."  (BSA § 4.1; Dan-Bunkering 56.1 ¶ 21).[3]

After TRESE and Ardica failed to make the first few required installment payments under the Bunker Supply Agreement, Dan-Bunkering sent TRESE several emails inquiring as to the status of the payments and whether it would be feasible to receive payments directly from Pemex.  (Dan-Bunkering 56.1 ¶ 24).  In one such email, Jim Jensen of Dan-Bunkering told Silva, "[u]nless you promptly start providing on the promises that you gave I will have no other option than to hand the case over to our legal department for collection." (Chester Decl., Ex. I).  On January 5, 2017, TRESE assured Dan-Bunkering that it was trying to obtain resources and that "as soon as this happens, we will be making payments to your company."  (*Id.*).  TRESE also explained that it would not be possible for Dan-Bunkering to receive payments directly from Pemex.  (Dan-Bunkering 56.1 ¶ 25).  In response, on January 9, 2017, Dan-Bunkering explicitly threatened to: "[s]tart legal proceedings to collect funds"; "report [TRESE] and [Ardica] to the Credit bureau"; and "[a]rrest the [Agosto 12

---

[3]     It appears from the summary judgment record that neither Ardica nor TRESE ever requested marine fuel products from Dan-Bunkering under the Bunker Supply Agreement, and, conversely, that Dan-Bunkering never supplied Ardica or TRESE with marine fuel products as contemplated.  (Dan-Bunkering 56.1 ¶ 23).

Platform] for unpaid bunkers and immediately stop all operation offshore."
(Chester Decl., Ex I).

On January 12, 2017, Obregon emailed TRESE yet again, reiterating that
Dan-Bunkering had several legal options to collect the debt and would utilize
each of them as it saw appropriate.  (Dan-Bunkering 56.1 ¶ 26).  This time,
Obregon copied Arias and others from Ardica, sharing with them the previous
emails between Dan-Bunkering and TRESE.  (*Id.*; Chester Decl., Ex I).
Ardica's Luz Maria Carillo forwarded Obregon's January 12, 2017 message to
George, who responded the same day, requesting more information concerning
the origin of the debt and its relation to the Agosto 12 Platform project.  (Dan-
Bunkering 56.1 ¶ 27).  Obregon responded by sending a copy of the Bunker
Supply Agreement Ardica had signed and stating that "I think you would agree
with us that we have been very patient and supportive towards TRESE and
Ardica by not initiating legal actions some months earlier, however we have
reached the limit when we must act."  (Chester Decl., Ex I).  On January 28,
2017, Dan-Bunkering provided further details about the underlying debt as
requested by Ardica, including invoice numbers, original amounts, and
information that the deliveries were in connection with the Agosto 12 Platform.
(Dan-Bunkering 56.1 ¶ 28).  George responded the same day, promising that
"[s]oon you will have news of Ardica."  (*Id.* at ¶ 29).

On February 8, 2017, Arias and George, on behalf of Ardica, attended a
meeting in Mexico City with Jensen and Ulrich Rasmussen, on behalf of Dan-
Bunkering, to discuss the debt.  (Dan-Bunkering 56.1 ¶ 30).  In a follow-up

7

email on February 9, 2017, Jensen thanked the Ardica representatives for a productive meeting and re-sent a note with explanations about the origins of the underlying debt.  (*Id.* at ¶ 31).  Jensen asked Ardica to request any further clarification Ardica needed.  (*Id.*).  Ardica did not request any further clarification of the debt.  (*Id.*).

On February 15, 2017, Ardica requested a new payment plan of 67 months at 5% per year to repay the $570,586 stated in the Bunker Supply Agreement.  (Dan-Bunkering 56.1 ¶ 32).  Over the course of the ensuing three weeks, Ardica and Dan-Bunkering exchanged a number of emails with their respective proposals and counter-proposals on the repayment plan.  (*Id.*).  Dan-Bunkering again threatened legal action on February 24, 2017, if Ardica did not accept a proposal of an eight-month repayment plan at 1.5% interest per month.  (*Id.* at ¶ 33).  On February 24, 2017, in an email to Dan-Bunkering, George wrote: "I appreciate your kindly [understanding] on this regard, that as you must be aware, is being difficulting for ARDICA, however, you must be confident that ARDICA will comply with its obligations for with your company." (*Id.* at ¶ 34).

On March 1, 2017, George emailed Dan-Bunkering stating:

> As ARDICA mentioned in the past meeting held in Camino Real CDMX and several emails, this matter has been unfair for ARDICA because, she is responding for a debt even when ARDICA didn't receive any service from your company, however, ARDICA understands this debt is related with the Project of the Platform Agosto 12 and in order to be in possibilities to continue with the same project, thats why ARDICA is accepting to pay the debt.

> You must communicate to your company that ARDICA
> is not refusing to pay, she is just trying to avoid any
> [un-fulfillment] to your company in the case ARDICA
> establish any other commitment that she couldn't
> afford.

(Chester Decl., Ex. P; *see* Dan-Bunkering 56.1 ¶ 35).

Rasmussen replied to George's message on March 3, 2017 and expressed

optimism that the parties were close to agreeing to a new repayment plan.

(Dan-Bunkering 56.1 ¶ 37). Rasmussen put forth another payment proposal

that would have allowed Ardica to repay the debt over 13 months at a 1.5%

monthly interest rate, which rate would decrease if Ardica made early

payments, and requested a reply by March 8, 2017. (*Id.*). George confirmed

receipt of Dan-Bunkering's latest payment proposal on March 3, 2017, but

never responded, and Ardica stopped communicating altogether. (*Id.* at ¶ 38).

## B.   Procedural History

Dan-Bunkering filed the Complaint in this action on December 8, 2017.

(Dkt. #1). On December 21, 2017, the Court appointed APS International, Ltd.

to effect service of process on TRESE and Ardica in Mexico. (Dkt. #9). Between

December 2017 and August 2018, the Court granted Plaintiff several

extensions to effect service on Defendants in Mexico, in accordance with the

Hague Convention. (Dkt. #14, 16, 18). On August 9, 2018, counsel for Ardica

filed a notice of appearance in the case, and asked for an extension of time to

answer or otherwise respond to the Complaint. (Dkt. #23-24). The Court

granted the request. (Dkt. #25).

TRESE was served on April 24, 2018, but never appeared in this action. (Dkt. #19).  On August 2, 2018, Dan-Bunkering obtained a Clerk's Certificate of Default against TRESE.  (Dkt. #22).  On August 21, 2018, the Court entered an order for TRESE to show cause, on October 9, 2018, why default judgment should not be entered against it.  (Dkt. #26).  TRESE did not appear on October 9, 2018, and the Court entered a default judgment against it in the amount of $570,586.00.  (Dkt. #35).

On September 14, 2018, Ardica filed its answer to the Complaint, which included seven affirmative defenses.  (Dkt. #31).  On October 26, 2018, Dan-Bunkering filed a motion to strike three of Ardica's affirmative defenses, pursuant to Federal Rule of Civil Procedure 12(f).  (Dkt. #36-37).  In addition to responding to Dan-Bunkering's motion, Ardica moved to dismiss the Complaint for lack of personal jurisdiction, *forum non conveniens,* and failure to state a claim.  (Dkt. #46-47).  On April 26, 2019, the Court issued an Opinion and Order on the motion to strike and the motion to dismiss.  (Dkt. #50).  The Court held that: (i) it had subject matter jurisdiction over the case, since the diversity jurisdiction requirements were satisfied; (ii) both parties had consented to personal jurisdiction in the Southern District of New York through the forum selection clause in the Bunker Supply Agreement; and (iii) *forum non conveniens* did not apply because of the forum selection clause. (*Id.*).  The Court also denied Ardica's motion to dismiss for failure to state a claim, holding that Dan-Bunkering had adequately pleaded a breach of contract claim.  (*Id.*).

The Court entered a civil case management plan and scheduling order on May 17, 2019.  (Dkt. #52).  Throughout discovery, Dan-Bunkering and Ardica encountered several disputes, which the Court resolved.  (*See* Dkt. #59-61, 67-68, 70-74).  On November 22, 2019, the Court ordered the parties to submit a proposed briefing schedule for their proposed cross-motions for summary judgment.  (Dkt. #78).  On November 26, 2019, the Court set a briefing schedule.  (Dkt. #81).

Both parties filed their motions for summary judgment on January 13, 2020.  (*See* Dkt. #84-91).  Dan-Bunkering and Ardica filed their opposition submissions on February 7, 2020.  (Dkt. #92-96).  Ardica then filed an amended memorandum of law in opposition to Dan-Bunkering's motion for summary judgment on February 8, 2020 (Dkt. #97) and an amended Counter-Statement to Dan-Bunkering's Rule 56.1 Statement (Dkt. #101).  Accordingly, the cross-motions for summary judgment are fully briefed and ripe for the Court's review.

## DISCUSSION

### The Court Grants Dan-Bunkering's Motion for Summary Judgment and Denies Ardica's Motion for Summary Judgment

**A.    Applicable Law**

**1.    Summary Judgment Under Fed. R. Civ. P. 56**

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a); *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986).[4]  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005).  "The district court's task on a summary judgment motion — even in a nonjury case — is to determine whether genuine issues of material fact exist for trial, not to make findings of fact."  *O'Hara* v. *Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 642 F.3d 110, 116 (2d Cir. 2011).

The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  The movant may discharge its burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322; *see also Selevan* v. *N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (finding summary judgment appropriate where the nonmoving party failed to "come forth with evidence sufficient to permit a

---

[4]     The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact.  *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) … chang[es] only one word — genuine 'issue' becomes genuine 'dispute.'  'Dispute better reflects the focus of a summary-judgment determination.").  This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refers to "genuine issues of material fact."

reasonable juror to return a verdict in his or her favor on an essential element
of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set
forth specific facts showing that there is a genuine issue for trial" using
affidavits or otherwise, and cannot rely on the "mere allegations or denials"
contained in the pleadings. *Anderson*, 477 U.S. at 248; *see also Wright* v.
*Goord*, 554 F.3d 255, 266 (2d Cir. 2009). In other words, the nonmoving party
"must do more than simply show that there is some metaphysical doubt as to
the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S.
574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the
true nature of the facts to overcome a motion for summary judgment," *Knight* v.
*U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986).

"When ruling on a summary judgment motion, the district court must
construe the facts in the light most favorable to the non-moving party and
must resolve all ambiguities and draw all reasonable inferences against the
movant." *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir.
2003). However, in considering "what may reasonably be inferred" from
witness testimony, the court should not accord the non-moving party the
benefit of "unreasonable inferences, or inferences at war with undisputed
facts." *Berk* v. *St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 342
(S.D.N.Y. 2005) (quoting *Cty. of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d
1295, 1318 (2d Cir. 1990)).

2.      **Breach of Contract Under New York Law**

"Under New York law, the elements of a breach of contract claim are [i] the formation of an agreement, [ii] performance by one party, [iii] breach of agreement by the other party, and [iv] damages."  *Berman* v. *Sugo LLC*, 580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008) (citing *First Investors Corp.* v. *Liberty Mut. Ins. Co.*, 152 F.3d 162, 168 (2d Cir. 1998)).  "To form a valid contract under New York law, there must be an offer, acceptance, consideration, mutual assent, and intent to be bound."  *Register.com, Inc.* v. *Verio, Inc.*, 356 F.3d 393, 427 (2d Cir. 2004).

It is a core principle of contract law that courts should enforce clear, unambiguous contracts according to their plain meaning.  *TAG 380, LLC* v. *ComMet 380, Inc.*, 10 N.Y.3d 507, 512-13 (2008).  When interpreting contracts governed by New York law, courts look exclusively at "objective manifestations" of the parties' intentions, thereby rendering "uncommunicated subjective intent irrelevant."  *Nycal Corp.* v. *Inoco PLC*, 988 F. Supp. 296, 301 (S.D.N.Y. 1997) (first quoting *Hotchkiss* v. *Nat'l City Bank of N.Y.*, 200 F. 287, 293 (S.D.N.Y. 1911) (Hand, J.) ("A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties."), *aff'd*, 201 F. 664 (2d Cir. 1912), *aff'd sub nom. Nat'l City Bank* v. *Hotchkiss*, 231 U.S. 50 (1913); then quoting *Wells* v. *Shearson Lehman/Am. Exp. Inc.*, 72 N.Y.2d 11, 24 (1988) ("Uncommunicated subjective intent alone cannot create an issue of fact where otherwise there is none."), *aff'd*, 166 F.3d 1201 (2d Cir. 1998)).

14

**B.      Ardica Owes Dan-Bunkering $570,586 Pursuant to the Bunker Supply Agreement**

It is undisputed that Ardica signed the Bunker Supply Agreement and transmitted the same to Dan-Bunkering on September 16, 2016.  (Dan-Bunkering ¶ 11).  The plain language of the Bunker Supply Agreement is unambiguous and makes TRESE and Ardica jointly and severally liable for paying $570,586 to Dan-Bunkering.  (*Id.* at ¶ 17).  It is also undisputed that TRESE and Ardica failed to pay Dan-Bunkering any of the $570,586, as set forth in the Bunker Supply Agreement.  (*Id.* at ¶¶ 6, 39).

Nevertheless, Ardica contends that the Court should grant summary judgment in its favor and find that it does not owe Dan-Bunkering any money under the Bunker Supply Agreement or any subsequent promise, on the ground that there was no consideration supporting the Bunker Supply Agreement.  (*See* Ardica Br. 11-17).  Ardica also argues that the Bunker Supply Agreement is vague and unenforceable, and that Dan-Bunkering has not alleged damages.  (*See id.* at 15-18).  The Court disagrees with all of Ardica's arguments and, for the reasons explained below, grants Dan-Bunkering's motion for summary judgment.

**1.      The Bunker Supply Agreement Was Supported by Adequate Consideration**

In New York, "consideration is a necessary ingredient for an enforceable contract."  *Roth* v. *Isomed, Inc.*, 746 F. Supp. 316, 319 (S.D.N.Y. 1990).  "Consideration … can take the form of either [a] promise or performance, [and] can be either a bargained for gain or advantage to the promisee or a bargained

15

for legal detriment or disadvantage to the promisor." *Id.* (citing *Holt* v. *Feigenbaum*, 52 N.Y.2d 291, 299-300 (1981)); *see also* 22 N.Y. JURISPRUDENCE 2D CONTRACTS § 64 (2013). Indeed, "it is enough that something is promised, done, forborne or suffered by the [the promisee] … as consideration for the promise made to him." *Weiner* v. *McGraw-Hill, Inc.*, 57 N.Y.2d 458, 464 (1982) (alterations omitted); *see also Halliwell* v. *Gordon*, 878 N.Y.S.2d 137, 139 (2d Dep't 2009) ("[F]orbearance to do an act that a person has a legal right to do constitutes consideration.").

Notably, consideration given by the promisee does not have to benefit the promisor, but rather can consist of a benefit to a third party. *See Thales Alenia Space France* v. *Thermo Funding Co., LLC,* 959 F. Supp. 2d 459, 465 (S.D.N.Y. 2013) ("For example … the discharge of one person from liability under a debt is a sufficient consideration for the promise of another to pay." (internal quotation marks omitted)); *Mencher* v. *Weiss*, 306 N.Y. 1, 8 (1953) ("[I]t is fundamental that a benefit flowing to a third person or legal entity constitutes a sufficient consideration for the promise of another."); *In re Asia Glob. Crossing, Ltd.*, 344 B.R. 247, 252 (Bankr. S.D.N.Y. 2006) (enforcing a guarantee and holding that "a contract is supported by consideration even if the consideration flows solely to a third party"); *Weiner*, 57 N.Y.2d at 464-65 (explaining that the court need not ask whether "the consideration does in fact benefit the promisee or a third party, or is of any substantial value to anyone" (internal quotation marks omitted)); *Holt*, 52 N.Y.2d at 300 (rejecting defense argument that contract lacked consideration and noting that benefit of promise

16

need not accrue directly to promisee); RESTATEMENT (SECOND) OF CONTRACTS § 71(4) & cmt. e (1981) ("It matters not from whom the consideration moves or to whom it goes.  If it is bargained for and given in exchange for the promise, the promise is not gratuitous."); 22 N.Y. JURISPRUDENCE 2D CONTRACTS § 64 ("[T]o constitute an adequate consideration for a promise, the benefit need not move to the promisor, as it may move to a third person.").  Accordingly, "a promisee who has incurred a specific, bargained for legal detriment may enforce a promise against the promisor, notwithstanding the fact that the latter may have realized no concrete benefit as a result of the bargain."  *Holt,* 52 N.Y.2d at 299 (internal citations omitted).

"It is [also] a settled principle of New York contract law that courts will rarely, if ever, investigate the adequacy of the consideration exchange."  *MM Ariz. Holdings LLC* v. *Bonanno,* 658 F. Supp. 2d 589, 593 (S.D.N.Y. 2009); *see Ferguson* v. *Lion Holdings, Inc.,* 312 F. Supp. 2d 484, 495 (S.D.N.Y. 2004) ("The adequacy of the consideration, or the value of the forbearance, is not a proper subject for the court's review." (citation omitted)).  So long as the consideration exchanged is something of "real value in the eye of the law," courts must honor the bargain struck by contracting parties even when the consideration exchanged is "grossly unequal or of dubious value."  *Apfel* v. *Prudential-Bache Sec., Inc.*, 81 N.Y.2d 470, 475-76 (1993) (quoting *Mencher*, 306 N.Y. at 8). "[C]ourts have not hesitated to find sufficient consideration not only in what is now the proverbial peppercorn, but in a horse or a canary, or a tomtit if the

promisee chose."  *Weiner*, 57 N.Y.2d at 464 (internal citations, quotations, and alterations omitted).

### a.    TRESE Received Consideration in the Form of Dan-Bunkering's Forbearance of a Legal Action Against It

Dan-Bunkering contends that: (i) TRESE received consideration in the form of a seven-month period to repay Dan-Bunkering for the marine fuel products it had received and failed to pay for; and (ii) under New York law, consideration to TRESE is sufficient to enforce Ardica's obligation to repay, as set forth in the Bunker Supply Agreement.  (Dan-Bunkering Br. 10-14).  Ardica attempts to chip away at the strength of this syllogism by arguing that: (i) the Bunker Supply Agreement is devoid of any language referencing "forbearance" or "withholding" litigation (Ardica Br. 7, 13-14); (ii) there is no evidence in the record that Dan-Bunkering's forbearance of legal action against TRESE was the basis of the Bunker Supply Agreement (*id.* at 14-15; Ardica Reply 4); (iii) Dan-Bunkering did not do anything in reliance on the Bunker Supply Agreement (Ardica Br. 11); (iv) there was no meeting of the minds between Dan-Bunkering and Ardica (Ardica Reply 3); and (v) any forbearance Dan-Bunkering afforded to TRESE did not flow to Ardica (*id.* at 7).  The Court easily dismisses each of Ardica's arguments.

Ardica's first argument, that the Bunker Supply Agreement is devoid of language referencing the forbearance, is of no moment.  Forbearance actually given can serve as consideration, even if not expressed in an agreement.  *See Granite Partners, L.P.* v. *Bear, Stearns & Co. Inc.*, 58 F. Supp. 2d 228, 254 (S.D.N.Y. 1999) ("Forbearance … can constitute consideration, even where the

forbearing party is not contractually obligated to refrain from exercising its rights." (collecting cases)); *see also* 2 CORBIN ON CONTRACTS § 5.22 (2019); 3 WILLISTON ON CONTRACTS § 7:44 (4th ed.) ("Actual forbearance is generally evidence of an agreement to forbear, and when viewed in connection with other facts and circumstances relating to the promise, an implied promise to forbear may be established which will be deemed to supply the necessary consideration.").

It thus follows that forbearance can be implied from the parties' conduct and the nature of the transaction.  *See, e.g., In re All Star Feature Corp.*, 232 F. 1004, 1009 (S.D.N.Y. 1916) ("[T]here was no express reference to forbearance in the contract and no statement that the lien was in exchange for it, but the situation reasonably implied that the parties so intended it."); *In re Stafford's Estate*, 34 N.Y.S.2d 946 (2d Dep't 1942) (enforcing testatrix's promise that if appellant would not file a claim against her husband's estate, she would pay interest on the promissory note until the estate was closed, and would then pay the balance), *aff'd*, 289 N.Y. 790 (1943).  Indeed, New York law is in accord with this black-letter principle of contract law.  In *Strong* v. *Sheffield*, 144 N.Y. 392 (1895), the New York Court of Appeals stated:

> There is no doubt that an agreement by the creditor to forbear the collection of a debt presently due is a good consideration for an absolute or conditional promise of a third person to pay the debt, or for any obligation he may assume in respect thereto.  Nor is it essential that the creditor should bind himself at the time to forbear collection or to give time.  If he is requested by his debtor to extend the time, and a third person undertakes in consideration of forbearance being given to become

> liable as surety or otherwise, and the creditor does in
> fact forbear in reliance upon the undertaking, although
> he enters into no enforceable agreement to do so, his
> acquiescence in the request, and an actual forbearance
> in consequence thereof for a reasonable time, furnishes
> a good consideration for the collateral undertaking. In
> other words, a request followed by performance is
> sufficient, and mutual promises at the time are not
> essential, unless it was the understanding that the
> promisor was not to be bound, except on condition that
> the other party entered into an immediate and
> reciprocal obligation to do the thing requested.

*Id.* at 394-95.

Further, in *Hohmann & Barnard, Inc.* v. *Sciaky Bros., Inc.*, 333 F.2d 5 (2d

Cir. 1964), defendant-seller appealed a judgment in favor of plaintiff-buyer on

the latter's breach of contract claim.  The defendant delivered defective

machinery to the plaintiff, who gave the defendant several weeks to correct the

defects.  *Id.* at 8.  After warning the defendant that it would do so, the plaintiff

contracted with a third party to make the necessary repairs to the machinery

and sought consequential damages.  *Id.*  The defendant argued that a

limitation of liability clause in the contract provided the exclusive remedy for

breach, and the plaintiff could not recover for repairs made by a third party.

*Id.* at 6-7.  The Second Circuit rejected the defendant's argument, observing

that the parties "embarked on a post-default course not specifically covered by

the contact" when the plaintiff afforded the defendant an extended opportunity

to repair the machines.  *Id.* at 9.  The Court held that although "the parties

entered into no formal agreement, their conduct ... shows that in return for the

plaintiff's forbearing to exercise its rights upon the default by the defendant

and for giving the defendant additional time to make repairs, the defendant gave up its right to insist on [enforcing] the [limitation of liability] clause." *Id.* Accordingly, it is of no moment that the Bunker Supply Agreement does not explicitly state that Dan-Bunkering's forbearance of an action against TRESE serves as consideration, so long as such forbearance can be implied from the circumstances of the parties' conduct and context of the transaction.[5]

Ardica's next three arguments — that the record is bereft of evidence that Dan-Bunkering's forbearance of legal action against TRESE was the basis of the Bunker Supply Agreement (*see* Ardica Br. 14-15), that Dan-Bunkering did not do "anything in reliance on the [Bunker Supply Agreement]" (*id.* at 11), and that there was no meeting of the minds between Dan-Bunkering and Ardica (*see* Ardica Reply 3) — are belied by the record in this case. The record unequivocally shows that Dan-Bunkering's forbearance of a legal action against TRESE was the driving force behind the Bunker Supply Agreement and that Dan-Bunkering indeed refrained from filing a legal action until after TRESE and Ardica had breached the Bunker Supply Agreement.

*First*, the Court notes that the record is clear that Dan-Bunkering's forbearance of a legal action against TRESE induced TRESE and Ardica to

---

[5]    Ardica cites *Reddy* v. *Mihos*, 76 N.Y.S.3d 13 (1st Dep't 2018), for the proposition that an agreement to forbear from suit must be made explicit in order to serve as consideration. However, *Reddy* is distinguishable from this case. In *Reddy*, the problem was that the forbearance was neither stated in the guaranty nor discernable from the circumstances. *Id.* at 17. The only implied forbearance was the plaintiff's potential refrainment from filing a criminal or disciplinary complaint against the defendant; but the court noted that would raise a substantial question as to whether such consideration would render the guaranty void as against public policy. *See id.* at 16 n.2.

enter into the Bunker Supply Agreement.  It is undisputed that, before the signing of the BSA, TRESE owed Dan-Bunkering $452,845.67.  (Dan-Bunkering 56.1 ¶ 5).  Prior to the execution of the Bunker Supply Agreement, Dan-Bunkering threatened legal action to collect TRESE's debt, and TRESE copied Ardica on communications in August 2016, thanking Dan-Bunkering for the latter's willingness to forgo such legal action.  (Chester Decl., Ex. F).[6] Not having received a signed agreement several weeks after it was sent, Dan-Bunkering emailed Ardica on September 14, 2016, stating "*[i]f we do not receive your signature today, my office will immediately proceed legally* seizing the jack-up platform from your sour gas compression project, preventing you from operating further with Pemex (*in addition to taking other legal actions*)." (Chester Decl., Ex. G (emphases added)).  The parties' understanding that Dan-Bunkering would forbear taking legal action in exchange for Ardica and TRESE signing the Bunker Supply Agreement is abundantly clear from the circumstances that preceded the execution of the agreement.  (*See* Chester Decl., Ex. A ("Obregon Dep.") 63:25-64:15, 69:19-70:4).  Thus, Ardica's claim that the record is "essentially bare of any communication between the parties

---

[6]     Ardica argues that the fact that the Bunker Supply Agreement was fully drafted by Dan-Bunkering's corporate counsel *before* Dan-Bunkering began explicitly threatening to take legal action against TRESE, shows that the Bunker Supply Agreement was *not* executed because of the threat of litigation.  (Ardica Reply 4-5).  But the mere fact that the Bunker Supply Agreement was drafted before Dan-Bunkering explicitly threatened TRESE with litigation does not impair Dan-Bunkering's argument regarding consideration.  Ardica itself cites testimony from Obregon that "there was a warning to TRESE and Ardica if you do not make any agreement with a firm payment plan with dates to us, we will arrest Agosto 12" prior to the Bunker Supply Agreement being "drafted and signed."  (*Id.* at 6 (quoting Obregon Dep. 54:13-55:2)).  All Ardica's timeline shows is that Dan-Bunkering came to the negotiating table with a proposal for repayment in hand.

discussing forbearance prior to signing the BSA" (Ardica Br. 5), is patently untrue.

*Second*, this record evidence defeats Ardica's unsupported argument that Dan-Bunkering did not do anything in reliance on the Bunker Supply Agreement.  Dan-Bunkering forwent an immediate legal action against TRESE and its interests, including those in the Agosto 12 Platform project, in reliance on TRESE's and Ardica's promises in the Bunker Supply Agreement to repay the Outstanding Amount.[7]  Instead of pursuing immediate legal action against TRESE, Dan-Bunkering allowed for a seven-month repayment, secured by Ardica's signature and promise to become unconditionally liable for the Outstanding Amount.  (*See* BSA §§ 2.1, 7.1-7.2; *see also* Chester Decl., Ex. C ("Arias Dep.") 58:9-60:7, 62:22-64:3).  The Bunker Supply Agreement sets forth the seven-month repayment plan expressly and unambiguously.  (BSA §§ 7.1-7.2).  Under similar circumstances, New York courts have consistently held that consideration exists.  *See Weiner*, 57 N.Y.2d at 464 (holding that something done, forborne or suffered in reliance upon a promise could be consideration for the promise); *see also Granite Partners*, 58 F. Supp. 2d at 254.

---

[7]     Ardica's argument that Dan-Bunkering's forbearance could not serve as consideration because the Agosto 12 Platform was not subject to arrest under Mexican law is beside the point.  (Ardica Reply 2-3).  Setting aside the merits of the contention under Mexican law, it is irrelevant because New York law only requires that the forbearing party have a good-faith belief in the validity of their claim for their forbearance to serve as valid consideration.  *See, e.g., Nolfi Masonry Corp.* v. *Lasker-Goldman Corp.*, 553 N.Y.S.2d 156, 157 (1st Dep't 1990); *C & D Dev., Inc.* v. *Sea Breeze Dev., LLC*, 874 N.Y.S.2d 560, 562 (2d Dep't 2009); 3 WILLISTON ON CONTRACTS § 7:46 (4th ed.).  Ardica fails to contend that Dan-Bunkering did not have such good-faith belief.

In *Granite Partners*, a sister court in this District rejected an argument similar to one Ardica makes here: that the subject agreements "did not themselves obligate [plaintiff] to do anything." 58 F. Supp. 2d at 254. After noting that defendants had "overestimate[d] the consideration actually required to form a valid contract," the court refused to dismiss the claim and held that forbearance, if actually given, would constitute sufficient consideration for the agreement. *Id.* at 254-55. In other words, a promisor is bound by their promise when the promisee incurs a bargained-for detriment in the form of forbearance actually given. *Id.* at 255 (stating that a bargained-for detriment can be consideration); *see also Jamaica Tobacco & Sales Corp.* v. *Siegel*, 336 N.Y.S.2d 258, 259 (2d Dep't 1972) (finding that guarantors are bound by their promises as soon as the creditor "act[s] upon defendant's promise to guarantee the debt … to [their] detriment"); *see also Traders' Nat'l Bank* v. *Parker*, 8 N.Y.S. 683, 687 (1st Dep't 1890) ("The plaintiff having agreed to forbear, and having done so, the obligation incurred by the defendant was perfected, and his liability consummated."), *aff'd*, 130 N.Y. 415 (1892). Because Ardica bargained for this forbearance, which Dan-Bunkering actually provided, it is clear that the Bunker Supply Agreement was supported by consideration.

*Third*, Ardica's final argument on this point — that there was no meeting of the minds — is also contradicted by the record evidence. Several emails in the summary judgment record confirm that Ardica was aware that Dan-Bunkering was forgoing bringing suit against TRESE in exchange for TRESE signing the Bunker Supply Agreement. (*See, e.g.*, Chester Decl., Ex. F and G).

24

Indeed, Ardica acknowledges that the record contains an e-mail from Obregon to TRESE, on which Ardica is copied, threatening litigation if Ardica did not sign the Bunker Supply Agreement.  (*See* Ardica Br. 5).[8]  These facts demonstrate that Ardica understood and agreed to the bargain that was struck in the form of the Bunker Supply Agreement.  As the Court has already explained, Ardica cannot defeat summary judgment by arguing that this consideration "did not accrue directly to [its] benefit."  *Holt*, 52 N.Y.2d at 300 (rejecting defense argument that contract lacked consideration and noting that benefit of promise need not accrue directly to promisee); *Thales Alenia*, 959 F. Supp. 2d at 467 (holding that "[c]onsideration does not have to flow to the promisor" and can "flow to a third party instead"); 3 WILLISTON ON CONTRACTS § 7:46 (4th ed.) ("It is immaterial whether the claim forborne is against the promisor or is a claim against a third person; the detriment to the promisee is the same, and it is not essential that there should be a benefit to the promisor.").

In any event, despite Ardica's argument that it never agreed to be responsible for TRESE's debt, it is clear that Ardica did obtain a benefit from the Bunker Supply Agreement.  TRESE and Ardica were partners on the Agosto 12 Platform project; if Dan-Bunkering had taken legal action against TRESE, such action would have been detrimental to Ardica's interest in the project. Ardica told Dan-Bunkering that it "underst[ood] this debt is related [to] the

---

[8]      Ardica's contention that Obregon testified at his deposition that he never personally met anyone from Ardica (*see* Ardica Reply 5) is of no legal import.

Project of the Platform Agosto 12 and in order to … continue with the same project, … ARDICA is accepting to pay the debt." (Dan-Bunkering 56.1 ¶ 36). Ardica also concedes that "continuance of the [Agosto 12 Platform] project was certainly of value to Ardica." (Ardica Br. 5).

Accordingly, the Court finds that Dan-Bunkering's forbearance of a legal action against TRESE suffices to establish that the Bunker Supply Agreement was supported by adequate consideration. For this reason, the Court does not address Dan-Bunkering's alternative theories of consideration (*see* Dan-Bunkering Br. 14-17), or its argument regarding Ardica's written acknowledgments of its obligation and promise to pay the amount stated in the Bunker Supply Agreement (*id.* at 17-19).

### 2.    Dan-Bunkering's Breach of Contract Claim Does Allege Damages

Ardica also contends that "Dan-Bunkering has failed to state what damages it sustained as a result of the alleged breach of the [Bunker Supply Agreement]." (Ardica Br. 15-16). It argues that Ardica's non-payment of TRESE's debt did not cause Dan-Bunkering to suffer any new harm or loss that had not already pre-existed at the time of the execution of the Bunker Supply Agreement. (*Id.* at 16). But Dan-Bunkering is seeking damages in the amount of $570,586 owed under the Bunker Supply Agreement, damages that Ardica failed to pay.

"Ordinarily, the purpose of contract damages is to give the injured party the benefit of the bargain by awarding a sum of money that will, to the extent possible, put that party in the position it would have been in had the contract

been performed." *Bank Midwest, N.A.* v. *Hypo Real Estate Capital Corp.*, No. 10 Civ. 232 (WHP), 2010 WL 4449366, at *3 (S.D.N.Y. Oct. 13, 2010).  Courts have long recognized that non-payment of an amount promised constitutes valid contract damages.  *See, e.g., id.* ("Nonpayment is a quintessential form of contract damages."); *Graham* v. *James*, 144 F.3d 229, 235 (2d Cir. 1998) (upholding damages award for failing to pay as promised under a contract); *Hawkins* v. *McGee*, 84 N.H. 114 (1929) ("The measure of recovery 'is based on what the defendant should have given the plaintiff[.]'" (quoting 3 WILLISTON ON CONTRACTS § 1341)).  Accordingly, Dan-Bunkering is entitled to damages in the amount of $570,586, the amount due to it under the Bunker Supply Agreement.

### 3.    The Bunker Supply Agreement Does Not Lack Definiteness or Mutual Assent

Ardica's last argument is that the Bunker Supply Agreement lacked definiteness and mutual assent.  (*See* Ardica Br. 17-18).  But Ardica does not identify any language lacking definiteness or certainty.  Rather, Ardica contends that the Bunker Supply Agreement was "a thinly-veiled attempt on the part of Dan-Bunkering to get someone on the hook for TRESE's debt which Dan-Bunkering knew would be difficult to collect from TRESE, and impossible to collect from that debtor once it submitted to bankruptcy proceedings in Mexico." (Ardica Br. 18).

Ardica's attempt to cast doubt on the fairness of the Bunker Supply Agreement does not move the Court.  As explained above, Dan-Bunkering was clear about its intention to have Ardica assume joint and several liability for

TRESE's debt; the Bunker Supply Agreement clearly states its intentions; and Ardica was aware that Dan-Bunkering had threatened to commence legal proceedings if Ardica did not agree to become jointly responsible for the Outstanding Amount.  Ardica's contention that it got the raw end of the deal is not enough to find the agreement unenforceable.  *See Weiner*, 57 N.Y.2d at 464 ("Far from consideration needing to be coextensive or even proportionate, the value or measurability of the thing forborne or promised is not crucial so long as it is acceptable to the promisee.").  Accordingly, the Court must enforce the Bunker Supply Agreement according to its clear and unambiguous terms.  *See Curtis Props. Corp.* v. *Greif Cos.*, 628 N.Y.S.2d 628, 632 (1st Dep't 1995) (noting that "courts avoid an interpretation that renders a contract illusory and therefore unenforceable for lack of mutual obligation and prefer to enforce a bargain where the parties have demonstrated an intent to be contractually bound" (internal citations omitted)); *TAG 380,* 10 N.Y.3d at 512-13 (confirming as a core principal of contract law that courts should enforce clear, unambiguous contracts according to their plain meaning).

## CONCLUSION

For the reasons explained above, Dan-Bunkering's motion for summary judgment is GRANTED and Ardica's motion for summary judgment is DENIED.

Dan-Bunkering is hereby ORDERED to submit a proposed final judgment on or before **July 24, 2020**.

The Clerk of Court is directed to terminate the motions at docket entries 84, 88, and 91.

28

SO ORDERED.

Dated:     July 10, 2020
           New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge